Robert G. Tyson v. Commissioner.
Robert G. Tyson v. Commissioner
Docket No. 18445.
United States Tax Court
1950 Tax Ct. Memo LEXIS 266; 9 T.C.M. (CCH) 162; T.C.M. (RIA) 50060; February 28, 1950
*266 Under the facts, held: (1) Upon failure of proof, respondent's determination of the net taxable income of petitioner for the taxable year 1945 is sustained. (2) Respondent did not err in determining fraud penalties in each of the taxable years 1944 and 1945. Muckleroy McDonnold, Esq., 1420 Transit Tower, San Antonio, Tex., for the petitioner. D. Louis Bergeron, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves deficiencies in Federal income tax and penalties for the calendar years 1944 and 1945, as follows: Penalties
Sec.
Sec.
Year
Deficiencies
Sec. 293(b)
Sec. 291(a)
294(d)(1)(A)
294(d)(2)
1944
$ 403.00
$ 201.50
$ 100.75
$ 40.30
1945
5,679.31
2,839.65
1,419.82
567.93
$340.76
The issues are: (1) whether the respondent erred in determining the net taxable income of petitioner, and (2) whether the penalties for fraud and delinquency should be imposed. Findings of Fact Petitioner is a resident of San Antonio, Texas. He did not file any individual income tax return for the taxable years 1944 and 1945. From 1943 to 1945, inclusive, *267 petitioner and Lonnie H. Rhodes were equal partners in the operation of a travel bureau engaged in transporting soldiers between Hondo and San Antonio, Texas, under the name of BBB Travel Service. On or about May 5, 1944, petitioner and Rhodes also became partners in the operation of a used car business in San Antonio, Texas, known as San Antonio Auto Exchange and also as San Antonio Automobile Exchange, hereinafter referred to as the partnership. Several attempts were made by various deputy collectors, during the course of routine investigations of social security and withholding taxes, to have petitioner and Rhodes file individual and partnership returns for the taxable years 1944 and 1945. Some time later, in May or early in June 1946, petitioner and Rhodes engaged a public accountant to prepare such returns. No returns were prepared. About August 5, 1946, the cases of petitioner, Rhodes, and their wives, and the two aforesaid partnerships were assigned to a special agent of the Intelligence Unit of the Bureau of Internal Revenue and an internal revenue agent, for joint investigation. Petitioner and Rhodes were contacted and conferences were held, at which the agents were advised *268 that the books were not available. Some 2,000 canceled checks, check stubs, and monthly bank statements were turned over to the revenue agents by the public accountant. Since 1939, the Motor Vehicle Division of the Texas Highway Commission has been required to keep records on all cars bought and sold in the State of Texas. In addition, each purchaser of an automobile has been required to file a purchaser's affidavit within 10 days with the County Tax Assessor, so that the one per cent transfer tax could be collected. During the years here involved, purchasers and sellers of automobiles were required by O.P.A. regulations to submit affidavits as to such purchases and sales. The customary method used generally and in this case in the purchase of automobiles for resale was to have a finance company "floor plan" the cars purchased. By "floor plan" is meant that the finance company issues its draft on a bank for part or all of the purchase price secured by the dealer's inventory when a dealer buys a car. When the dealer sells the car, the balance of the consideration over and above the cash paid by the purchaser is financed by the finance company for the purchaser of the car. When the *269 purchaser completed his payments to the finance company, the latter, except the San Antonio Mortgage Company, paid to the dealer, the partnership, so-called bonuses, commissions or kickbacks. In all instances above referred to, whether the O.P.A., state, county, or finance companies, the records disclosed the name and address of the purchaser or seller of the used car, as well as the name, year, type, motor number and consideration involved. No records being available as to purchases and sales of used cars by the partnership, it was necessary for the revenue agents to contact all the above governmental agencies and finance companies. After a careful check and recheck of all such records, the respondent determined the known purchases and sales of used cars for the taxable years to be as follows: Number
Sales
Year 1944
of Cars
Cost
Price
Opening Inventory
0
Purchases
60
$ 66,444.11
Total
60
$ 66,444.11
Less: Closing In-
ventory
12
14,328.96
Totals
48
$ 52,115.15
$ 65,463.11
Year 1945
Opening Inventory
12
$ 14,328.96
Purchases
350
297,080.11
Total
362
$311,409.07
Less: Closing In-
ventory
52
50,729.31
Totals
310
$260,679.76
$358,962.39
*270 The partnership also acted as agent in two transactions for which it received total commissions in the sum of $100. On May 5, 1944, the partnership opened a checking account at the Frost National Bank. The aggregate deposits and withdrawals for the periods May 5 to December 31, 1944, and January 1 to December 31, 1945 were as follows: Year
Deposits
Withdrawals
1944
$ 24,110.61
$ 22,924.21
1945
311,442.40
303,557.25
From the canceled checks secured from petitioner's public accountant, the respondent determined the disbursements made by the partnership for the years 1944 and 1945 to be as follows: 1944
1945
Partner Withdrawals
$ 100.00
$ 687.87
Payments on Cars: San Antonio Mortgage
Co.
10,376.00
26,468.28
Pacific Finance Co.
51,639.18
Associates Investment
Co.
96,366.22
Others
465.42
11,250.89
Individuals
8,813.00
78,731.34
Customer Refunds
157.00
4,043.27
Salaries and Commissions
301.60
8,797.26
Taxes and Licenses
156.91
2,603.62
Travel and Towing
715.46
6,127.04
Merchandise Investments
1,924.53
12,824.40
Operating Expenses
303.40
5,977.91
Capital Expenditures
570.00
7,737.15
Totals
$23,883.32
$313,254.43
*271 In addition to the total commissions in the amount of $100 on the two cars previously referred to, the partnership, during the taxable year 1945, received from the finance companies bonuses, commissions and kickbacks on its retail sales of used cars in the following amounts: Number of
Other
Transactions
Income
Universal CIT Credit Co.
17
$ 556.98
Pacific Finance Co.
45
1,452.94
Associates Investment Co.
81
4,600.44
Totals
143
$6,610.36
Inasmuch as Associates Investment Co. had only paid the partnership $1,818.49 of the amount of $4,600.44, the balance of $2,781.95 was accrued as a receivable. Respondent determined that the total capital expenditures for 1945, as disclosed by the canceled checks, were $7,737.15. Depreciation was computed and allowed on the depreciable assets as follows: Depreciation
Cost
Rate
Allowed
Building & improve-
ments
$2,362.92
33 1/3%
$262.55
Neon signs
218.10
10%
4.47
Office furniture &
fixtures
337.76
10%
13.74
Repair shop
724.50
10%
20.08
Total depreciation allowed
$300.84
The profit and loss of the partnership for the taxable years 1944 and 1945 was *272 arrived at and determined as follows: Year Ended 12/31/44
Year Ended 12/31/45
Sales
$65,463.11
$358,962.39
Less Cost
of Sales: Opening
Inventories
Used Cars
None
$14,328.96
Taxes and
Licenses
None
None
Mdse.
Investments
None
415.03
Travel and
Towing
None
None
154.29
$14,898.28
Purchases
$66,444.11
297,080.11
Taxes and
Licenses
156.91
2,603.62
Mdse.
Investments
1,924.53
12,824.40
Travel and
Towing
715.46
6,127.04
Total
$69,241.01
$333,533.45
Less
Closing
Inventories: Used Cars
$14,328.96
$50,729.31
Taxes and
Licenses
None
None
Mdse.
Investments
415.03
2,185.22
Travel and
Towing
154.29
14,898.28
54,342.73
1,044.02
53,958.55
279,574.90
GROSS
PROFITS
$11,120.38
$ 79,387.49
Less Deductions: Depre-
ciation
$ 300.84
Salaries and
Commissions
$ 225.43
9,544.02
Advertising
17.00
321.69
Tel. and Tel.
6.45
758.02
Interest
536.35
1,420.52
Legal
Expenses
200.00
Insurance
1,048.83
Bad Debts
1,247.00
Rent
725.00
Utilities
226.61
Tools
42.54
S.S.T.
2.23
94.50
Miscellaneous
21.00
373.07
Parking
40.35
848.81
16,302.64
NET PROFITS FROM
OPERATIONS
$10,271.57
$ 63,084.85
Add Other
Income: Commissions
None
$ 100.00
Bonuses,
Rebates,
etc.
None
None
6,610.36
6,710.36
NET TAXABLE
INCOME
$10,271.57
$ 69,795.21
*273 No cash items, whether receipts or disbursements, were reflected in arriving at the taxable net income of BBB Travel Service or the partnership, if received or expended in cash, except petty cash items. Petitioner's living expenses were at least $300 per month during 1944 and 1945. He paid a jewelry company $45 a month in 1945, and withdrew $2,500 to pay on a home. During 1945 he also acquired a 1942 Buick convertible automobile, at a cost of $2,500, from funds withdrawn from the business and not reflected in the 1945 disbursements. Petitioner's share of the profits of BBB Travel Service was $837.86 in 1944 and $39.62 in 1945. Petitioner's share of the partnership profits was $5,135.79 in 1944 and $34,897.61 in 1945. One half of such amounts was taxable income to petitioner and one half to his wife. Petitioner failed to file a declaration of estimated tax return for 1944. Petitioner filed a delinquent declaration of estimated tax return for 1945. Some part of the deficiency for each of the taxable years 1944 and 1945 was due to fraud with intent to evade tax. Opinion Petitioner, with respect to the taxable year 1944, contests only the 50 per cent fraud penalty imposed *274 pursuant to section 293 (b) of the Internal Revenue Code. For the taxable year 1945, petitioner contests both the amount of the deficiency in income tax and the imposition of the 50 per cent fraud penalty. Petitioner concedes his liability for the delinquency penalties imposed in each of the taxable years involved. He also concedes the amount of the income tax deficiency determined for the year 1944. The principal question presented involves a determination of the amount of the net taxable income for the year 1945. In that year the respondent determined petitioner's net taxable income from the BBB Travel Service was $39.62. This amount is not in dispute. The respondent also determined that petitioner's net taxable income from the partnership was $17,468.62. The respondent's determination is presumptively correct, and the burden is upon petitioner to establish error. The record establishes that petitioner failed to file any income tax return for the taxable year 1945. Such books as were maintained by the partnership were turned over to a public accountant. While the books were in the possession of the accountant they disappeared in some unaccountable manner *275 and were not available. A box containing some 2,000 canceled checks, check stubs and bank statements was preserved and was turned over to the revenue agents making an investigation of petitioner's tax liability. With these and a laborious investigation of the public records required in cases of transfer and sale of used automobiles, together with the records of various automobile finance companies with which the partnership dealt, the respondent reconstructed a partnership profit-and-loss statement, which is set forth in our findings of fact. From such profit-and-loss statement, the respondent determined the net income of the partnership for the year 1945. Petitioner does not challenge or attempt to explain the various items of receipts and disbursements used by the respondent in arriving at the net income of petitioner. The sole contention of petitioner is that the method pursued by the respondent is improper. He argues that where no complete records are available, his net income should be determined by the use of the net worth formula. Conceding that such formula has often been approved, it is not an exclusive method. Other methods which furnish a reasonable basis for determining *276 net taxable income have been approved. Cohen v. Commissioner, 176 Fed. (2d) 394; Nazzareno D. Cesanelli, 8 T.C. 776; Estate of Joseph Nitto, 13 T.C. 858 (Nov. 30, 1949). Under the facts disclosed by this record, the method adopted by the respondent was reasonable, and provided, we think, a more nearly accurate means of calculating the approximate net taxable income of petitioner than the use of the net worth formula. The sources from which the respondent obtained the information on which his determination was based were presumptively accurate and reliable. In the absence of evidence to the contrary, we should accept them as truly recording the facts contained therein. We therefore conclude that petitioner has failed to sustain the burden of establishing error in the respondent's determination of the amount of his net taxable income for the year 1945. There remains for consideration the contention of petitioner that the 50 per cent fraud penalty should not be imposed in either taxable year involved. Petitioner filed no income tax returns for either of the taxable years 1944 or 1945. He offers as an explanation for failure to file a return for *277 the year 1944, that he believed his income was insufficient to require a filing of a return. Petitioner attempts to excuse his failure to file a return for 1945 by stating that his accountant advised him to wait until the investigation then being made by the internal revenue agents was completed. The reasons advanced are insufficient to relieve him of the penalties. Home Guaranty Abstract Co., 8 T.C. 617; Nazzareno D. Cesanelli, supra.We think the receipts were so substantial and the reasons for failing to report such income were so flimsy as to constitute affirmative and convincing evidence that such failure was fraudulent and occurred with the intent to evade tax in both years. Upon a consideration of the entire record, we conclude that the respondent has sustained his burden of proof of fraud. We have found as a fact that a part of the deficiency in each of the taxable years 1944 and 1945 was due to petitioner's fraud with intent to evade tax. The respondent properly imposed the 50 per cent penalty in each of the taxable years pursuant to section 293 (b) of the Internal Revenue Code. Decision will be entered for the respondent. *278